UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

JERRY THOMPSON,

        Plaintiff,

    v.

INSURANCE AND BENEFITS
TRUST/COMMITTEE PEACE OFFICERS
RESEARCH ASSOCIATION OF
CALIFORNIA, PEACE OFFICERS
RESEARCH ASSOCIATION OF
CALIFORNIA, and DOES 1 to 100,

        Defendants.

NO. CIV. S-08-650 FCD/GGH

MEMORANDUM AND ORDER

----oo0oo----

This matter is before the court on the parties' cross-motions for judgment on the administrative record, pursuant to Federal Rule of Civil Procedure 52,[1] arising out of defendants

_____

[1]   Rule 52(a)(1) provides in pertinent part: "In an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court;" see also Kearney v. Stnd. Insur. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999) (recognizing in an ERISA matter, the propriety of trying the case on the administrative record).

1

Insurance and Benefits Trust of Peace Officers Research Association of California and Peach Officers Research Association of California's (collectively, "defendants" or "PORAC") denial of plaintiff Jerry Thompson's ("plaintiff") claim for long-term disability ("LTD") benefits.[2]

For the reasons set forth below, the court finds that the proper standard of review of this matter is abuse of discretion, as opposed to de novo, and thereunder, the court finds that PORAC did not act arbitrarily or capriciously in denying plaintiff's LTD benefits claim.  As such, the court DENIES plaintiff's motion for judgment in his favor and HEREBY GRANTS judgment in favor of PORAC.

**BACKGROUND**

A.   **The Plan**

Plaintiff is a participant in a long term disability benefit plan (the "Plan") sponsored by the Insurance and Benefits Trust of Peace Officers Research Association of California.  The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). (Pl.'s Compl., filed Mar. 25, 2008, ¶ 6.)  PORAC is responsible for payment of benefits during the "Self-Funded Period," which is defined as "[t]he first 5 years of each period of continuous Disability, and the period after the end of the Maximum Benefit Period during which [long term disability] Benefits are payable under the Lifetime Disability Benefit provision."  (Administrative Record ["AR"], Ex. A to

---

[2]     Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs.  E.D. Cal. L.R. 78-230(h).

Jimenez Decl. [Docket #29], filed Aug. 10, 2009, at P00434.)  The
Plan is funded during the self-funded period by contributions
from Plan participants.  (Jimenez Decl., ¶ 3.)  PORAC derives no
financial benefit in the event of a denial of a participant's
claim for benefits under the Plan.  (Id. at ¶ 4.)  Standard
Insurance Company provides insurance benefits to the Plan, but
only for the period of time following the Self-Funded Period.
Under the Plan, PORAC is responsible for managing the Plan
and determining eligibility for benefits during the Self-Funded
Period.   In connection with disabilities relating to
musculoskeletal and connective tissue, the Plan limits benefits
to a maximum of 24 months. (AR: P00436.)

In pertinent part, the Plan defines disability as follows:

You are Disabled if you meet one of the following
definitions during the period it applies:

A. Own Occupation Definition of Disability; [or]
B. Any Occupation Definition of Disability . . .

Own Occupation means any employment, business, trade,
profession, calling or vocation that involves Material
Duties of the same general character as your regular and
ordinary employment with the Employer.  Your Own Occupation
is not limited to your job with your Employer.

Material duties means the essential tasks, functions and
operations, and the skills, abilities, knowledge, training
and experience, generally required by employers from those
engaged in a particular occupation.

A.   Own Occupation Definition of Disability

During the Benefit Waiting Period and the Own
Occupation Period you are required to be Disabled only
from your Own Occupation.

You are Disabled from your Own Occupation if, as a
result of Physical Disease, Injury, Pregnancy
or Mental Disorder, you are unable to perform with
reasonable continuity the Material Duties of your Own
Occupation.  However, you will not be considered to be
disabled from your Own Occupation if you are working in

3

a light duty position for the same employer for which
you were working when you became disabled, and your
employer is paying you the same wages paid to you
immediately before you became disabled.

B.   Any Occupation Definition of Disability

During the Any Occupation Period you are required to be
Disabled from all occupations.

You are Disabled from all occupations if, as a result
of Physical Disease, Injury, Pregnancy or  Mental
Disorder, you are unable to perform with reasonable
continuity the Material Duties of any gainful
occupation for which you are reasonable fitted by
education, training and experience.  (AR:  P00439-440.)[3]

**B.   Plaintiff's Medical History Leading Up to His Claim for Plan Benefits**

Plaintiff was employed by San Joaquin County as a
Correctional Officer.  "Employees of this class are responsible
for following clearly established procedures in receiving
prisoners, maintaining discipline and preventing escapes."  (AR:
P00244.)  Employees in this position are required to have the
ability to:

Supervise inmates engaged in a variety of activities;
store, issue and account for recreation equipment, clothing,
cleaning supplies and other items; understand and interpret
rules and regulations; keep records and prepare reports;
remain alert at all times and react quickly and calmly in
emergency situations; follow oral and written instructions;
establish and maintain effective working relationships
with others; learn to utilize data terminals as required.

(AR: P00245.)

On July 15, 2004, plaintiff was injured while running to
break up a fight between prisoners at the county jail.  (AR:
P0024, P00232.)  Prior to this, plaintiff fell off a wall while

---

[3]      The "Own Occupation Period" is "the Benefit Waiting
Period and the next 24 months of continuous Disability."  (AR:
P00435.)  The "Any Occupation Period" is "[f]rom the end of the
Own Occupation Period to the end of the Maximum Benefit Period."
(Id.)

1  engaged in training activities in June 2004.  He experienced some

2  minor pain at the lumbosacral portion of the spine at that time,

3  as well as a cramping sensation in his right lower extremity, but

4  he did not seek medical attention as a result of this incident

5  and continued to work.  (AR: P00179.)

6      On July 15, 2004 while he was running, plaintiff fell and

7  landed on the right side of his body.  More specifically, he

8  claims that while running, he experienced a cramp in his right

9  leg that caused him to fall to the concrete sidewalk.  When he

10  rose, he reported severe pain on the back of his leg.  (AR:

11  P00408.)  On that same date, plaintiff filled out an "Employee's

12  Claim for Workers' Compensation Benefits," stating that his right

13  elbow and leg were injured. (AR: P00226.)

14      Plaintiff saw Dr. Gregory Rosellini for his claimed injuries

15  on July 15, 2004.  In his "Doctor's First Report of Occupational

16  Injury or Illness" on that date, Dr. Rosellini diagnosed

17  plaintiff with a "muscle strain hamstring" and "abrasions-

18  multiple." (AR: P00408).  Plaintiff was given an ACE wrap,

19  crutches, Tylenol #3 with codeine and Motrin.  Future treatment

20  was noted as "possibly PT [physical therapy]".  Dr. Rosellini

21  noted that plaintiff was authorized to return to work on July 19,

22  2004. (Id.)

23      A July 16, 2004 Primary Treating Physician's Progress Report

24  referred to a hamstring strain, with plaintiff reporting mild but

25  much improved pain.  (AR: P00407.)  Plaintiff was authorized to

26  return to full duty on July 22, 2004.  (Id.)

27      Plaintiff was thereafter seen on August 9, 2004 by a Dr.

28  Zuniga.  He reported that he was feeling better but still had

some pain in the right hamstring.  (AR: P00403.)  A Physician's
Verification of Employee Illness form dated November 2, 2004
authorized plaintiff to return to work with restrictions (no
running, jumping or altercations) on November 2, 2004, and to
return to work without restrictions starting December 2, 2004.
(AR: P00379, P00383.)

Plaintiff continued to report right knee pain and that his
knee was "giving out" during a December 14, 2004 doctor's visit.
He was authorized to return to work full time January 29, 2005.
(AR: P00377-378.)  The return to work date was extended to
February 22, 2005 during a January 31, 2005 doctor's visit. (AR:
P00376.)

A magnetic resonance imaging ("MRI") test of the right knee
was recommended.  (AR: P00368.)  Plaintiff underwent the right
knee MRI on February 11, 2005.  The radiologist opined that
plaintiff's right knee was normal.  (AR: P00370.)

On March 28, 2005, plaintiff stated that he had started
"TRT" or "trauma release therapy."  (AR: P00363, P00365.)  His
subjective complaints at that time were that his right hip and
thigh went numb and that his right knee "pops."  He also referred
to "mild back pain" and right calf cramps.  (AR: P00365.)  He was
nevertheless advised to continue on full work duty and to
continue with trauma release therapy. (AR: P00363.)

Plaintiff again complained of recurrent lower back pain in
an April 18, 2005 doctor's visit (as well as right knee pain).
An MRI of the lumbosacral spine was suggested and Naprosyn and
Soma were recommended for pain.  (AR: P00362.)  Light duty was
recommended during an April 22, 2005 doctor's visit.  (AR:

6

P00360.)  Plaintiff was allowed to return to work with restrictions (no lifting over 10 pounds and no prolonged standing over 3 hours) on April 22 and directed to return to work without restrictions on May 23, 2005.  (AR: P00357.)

On May 3, 2005, plaintiff underwent a lumbar spine MRI without contrast.  The MRI revealed "[m]inimal disc dehydration at L4-5, but no disc herniation, protrusion, or osteophytes into the spinal canal throughout the lumbar spine.  [¶] Minimal disc bulging at the neural foramina not impinging on the nerve roots at L4-5 and L5-S1. [¶] Mild face degenerative changes throughout the lumbar spine."  (AR: P00355.)  That same report noted "good alignment of the lumbar spine . . . vertebral bodies . . . normal in height . . . normal signal of the vertebral bodies . . . normal signal of the spinal cord . . . a generous-sized spinal canal . . . disc spaces throughout the lumbar spine are well maintained . . . normal disc hydration, except for minimal disc dehydration at L4-5 . . . no posterior disc bulging, protrusion, or osteophytes . . . no encroachment on the spinal canal . . . minimal disc bulging at the neural foramina at L4-5 and L5-S1, not impinging on the nerve roots . . ." and ". . . mild facet degenerative changes throughout the lumbar spine."  (Id.)

A May 13, 2005 progress report notes that plaintiff may return to work with restrictions on May 13, 2005 (no lifting over 10 lbs and no prolonged standing over 3 hours) and may return to work without restrictions on June 14, 2005.  (AR: P00350.)

On August 4, 2005, plaintiff saw Dr. Moris Senegor. Plaintiff reported that since July 15, 2004, he had been experiencing low back pain and right leg pain radiating down the

leg towards the foot.  He also reported tingling paresthesias
over the right lateral calf and in the foot.  He indicated that
he had so far received only some massage therapy which had not
helped, that he worked full time from the time of his injury
until December 2004 and that he had worked on and off since then.
(AR: P00347.)  Dr. Senegor's impression was that plaintiff's
symptoms were secondary to degenerative disc disease, and he
recommended physical therapy.  He recommended temporary total
disability ("TTD") for worker's compensation purposes for six
weeks and stated that if physical therapy fails, epidural steroid
injections would be considered.  Dr. Senegor also noted that the
MRI scan reflected "no nerve compression."  (AR: P00338-339.)

     Plaintiff again saw Dr. Senegor on October 19, 2005 and Dr.
Senegor's report noted that "[t]he patient's symptoms remain
unchanged."  Dr. Senegor advised plaintiff that he would extend
plaintiff's TTD for six weeks at which time he would reevaluate
him.  (AR: P00303.)  Between that date and November 30, 2005,
plaintiff had four physical therapy sessions.  Dr. Senegor stated
on November 30, 2005 that the outcome of that physical therapy
was "not quite clear as of yet."  Plaintiff reported ongoing low
back pain and right leg pain and stated that he was taking
"narcotic medications."  Dr. Senegor stated he would see
plaintiff in another six weeks.  (Id.)

     A December 29, 2005 Progress Report for the period November
22, 2005 through December 28, 2005, from Darlynne D. Giorgi, the
nurse consultant assigned to plaintiff's worker's compensation
case states, in relevant part, that: "Thompson was reevaluated by
Dr. Senegor on November 30, 2004 . . . Dr. Senegor is continuing

8

Mr. Thompson at TTD for an additional 6 weeks since he has only completed four physical therapy sessions.  Physical therapist at Oak Valley Physical Therapy facility indicates that Mr. Thompson's weight is a factor in his slow progress.  He continues to report low back discomfort, and his gains in physical therapy are short lived . . . .  I telephoned Dan Pipel at Oak Valley Physical Therapy facility . . . He advised me that he had discussed Mr. Thompson's weight issues with him and how he would benefit from losing weight, which is causing additional strain on his lumbar spine."  (AR: P00288-289.)

On January 11, 2006, plaintiff visited Dr. Senegor.  Dr. Senegor's report indicates that plaintiff was "unimproved with the physical therapy prescribed.  He has also developed a right upper quadrant pain that he feels that the physical therapy somehow caused and a suspicion of a hernia has been raised.  I advised the patient that this should be worked up by a general surgeon initially on a nonindustrial basis and if any industrial causation is found, that this be brought back into the workers' compensation system on a retroactive basis."  Dr. Senegor concluded that because physical therapy had not resulted in a change of plaintiff's reported symptoms, he recommended epidural steroid injections.  (AR: P00295.)

On February 14, 2006, plaintiff underwent his first lumbar epidural steroid injection at St. Joseph's Hospital.  (AR: P00281.)  On March 2, 2006 he reported to Dr. Senegor that the epidural injection made his back pain worse for several days and he experienced no benefit.  He elected not to repeat the procedure.  (AR: P0274.)

On March 13, 2006, plaintiff underwent a second lumbar spine MRI scan.  That scan showed "[m]inimal disc dehydration L4-5 but no disc bulging, protrusion or osteophytes and no encroachment on the spinal canal.  The neural foramina demonstrate wide patency at L1-2 with minimal disc bulging L2-3, L3-4 and mild at L4-5 and L5-S1.  These are slightly increased since the patient's previous examination but do not appear to impinge on the nerve roots within the neural foramina."   The conclusion was "mild facet degenerative changes throughout the lumbar spine the same as on the patient's previously [sic] examination."  (AR: P00270-271.)  Dr. Senegor reviewed the MRI scan on April 13, 2006.  His report states that the MRI study "reveals mild desiccation at the L4-5 level.  There is no bulging, end plate irregularities, or modic changes.  The remainder of the discs look ok.  There is no significant nerve compression. The radiologist read out mild facet changes, these are, in my opinion, very mild."  (AR: P00264.)  Dr. Senegor advised plaintiff that the MRI findings were "not sufficient to support surgical management of the patient's condition."  They discussed the discography procedure which plaintiff declined, and Dr. Senegor and plaintiff agreed "to manage the situation conservatively from here on."  (AR: P00264.)

On May 11, 2006, Dr. Senegor met with the nurse case manager overseeing plaintiff's worker's compensation claim.  The nurse case manager asked questions relating to how plaintiff's case (which began with a right knee and elbow injury) "went from different body parts to his lumbar spine several months after the industrial injury."  Dr. Senegor responded that he was in "no

position to opine about causation since [he] did not
receive any documentation of the injury and treatment prior to
the patient's first consultation with [him]." Dr. Senegor also
pointed out that "the overall extent of the disability with
regards to the lumbar spine does not match the patient's
radiological findings which are rather scant (minimal
degeneration at L4-5)." (AR: P00263.) Nurse consultant Giorgi's
recitation of her meeting with Dr. Senegor was consistent: "I met
with Dr. Senegor on May 11, 2006 in an attempt to clarify how the
original injury of the right leg and right elbow changed to right
knee and now the lumbar spine. Dr. Senegor advised me that he
cannot answer that question, since he doesn't know the answer . .
. He indicated [that] Mr. Thompson had little pathology and the
length of his disability did not . . . match up to the few
medical findings." (AR: P00260.)

### C. Plaintiff's Claim for Benefits and PORAC's Initial Denial of the Claim

On May 7, 2006, plaintiff submitted to PORAC his completed
Long Term Disability Benefits Employee's Statement. (AR:
P00021-23.) The basis of the purported disability was "lower
lumbar spine injured."

On May 12, 2006, Dr. Senegor completed an Attending
Physician's Statement in support of plaintiff's claim. (AR:
P00240-241.) The primary diagnosis was degenerative lumbar disc
disease, with symptoms of low back and right leg pain. (AR:
P00240.) In a section of the form entitled "Assessment," Dr.
Senegor was asked to "[d]escribe the patient's physical, mental
and cognitive limitations and work activity limitations." Dr.

11

Senegor's response was "0."   However, he made contrary statements
that he "never" expected to see a fundamental or marked change in
plaintiff's condition, and that he "never" anticipated plaintiff
to return to work.   Dr. Senegor indicated that plaintiff was 5'8"
and 280 pounds at that time, as opposed to 220 pounds at the time
of the accident on July 15, 2004.  (AR: P00241.)  Related to
plaintiff's claim, the San Joaquin County Sheriff's Department
submitted an Employer's Statement to PORAC on May 16, 2006.  (AR:
P00242-243.)

On June 2, 2006, PORAC sent plaintiff a letter acknowledging
receipt of his application for benefits under the Plan.   That
letter stated, among other things, that PORAC had requested
copies of plaintiff's workers compensation file, was evaluating
the claim for benefits, and would keep him advised of the status
of the claim.  (AR: P00230.)  On June 13, 2006, PORAC notified
plaintiff that it was extending the time to decide his claim by
30 days, during which time PORAC would clarify plaintiff's long
term disability coverage from his employer.  (AR: P00216.)

On July 31, 2006, Renee Lugo of PORAC wrote plaintiff and
advised him that PORAC had determined that the medical evidence
did not support a claim of disability.  (AR: P00213-215.)  That
letter advised plaintiff that PORAC's decision was based on the
claim file as a whole, including the Employer's Statement (AR:
P00242-243), plaintiff's Employee's Statement (AR: P00021-23),
the Attending Physician's Statement completed by Dr. Senegor
(AR: P00240-241), a copy of plaintiff's worker's compensation
claim file and a telephone conversation with Samantha Menor of
the San Joaquin County Sheriff's Department that took place on

12

1   July 31, 2006.  (AR: P00213-214.)

2       The July 31, 2006 letter summarized PORAC's findings
3   regarding the claim file and discussion with plaintiff's employer
4   as follows:

- Plaintiff was off work from July 16, 2004 to July 21, 2004 at which time he returned to work full duty until November 22, 2004.  He was then placed on modified duty but his employer was unable to accommodate limitations. (AR: P00214.)

- The February 2005 MRI scan of the right knee showed normal findings.  (Id.)

- Plaintiff returned to work from February 23, 2005 through April 21, 2005.  He was placed on modified duty as of April 22, 2005 but his employer was unable to accommodate his restrictions.  He has not worked since April 22, 2005.  (Id.)

- Dr. Senegor's May 12, 2006 Attending Physician's Statement reflects a diagnosis of degenerative disc disease and recommended that he stop working because his symptoms were unchanged and the anticipated date for returning to work is "never."  (Id.)

- An April 22, 2005 exam revealed a positive lumbosacral paraspinal muscle spasm.  The May 2005 lumbar spine MRI showed minimal disc dehydration at L4-5 but no herniations, protrusions, or osteophytes in the spinal canal.  A May 13, 2005 office note regarding a visit to Dr. Zuniga noted that plaintiff no longer had right knee complaints but did have complaints of low back

pain and radiculopathy. (Id.)

- Dr. Senegor became plaintiff's treating physician on August 4, 2005. Plaintiff's gait was "belabored" on August 4, 2005 but "normal" on August 12, 2005. He attended physical therapy in November 2005 that was discontinued due to lack of improvement. An epidural steroid was injected in February 2006. Plaintiff did not wish to repeat that procedure. (Id.)

- A March 2006 lumbar spine MRI showed minimal disc bulging at L2-3 and L3-4, and mild disc bulging at L4-5, but no impingement on the nerve roots within the neural foramina. Dr. Senegor noted that plaintiff was permanent and stationary with restrictions of no lifting over 10 pounds, no excessive bending, twisting, or stooping and no continuous sitting or standing over 30-45 minutes. Dr. Senegor concluded that plaintiff was not able to return to work in his prior occupation. (AR: P00214-215.)

- Dr. Senegor also concluded, to the contrary, that "the overall extent of the disability with regards to the lumbar spine did not match the patient's radiological findings which are rather scant." (AR: P00215.)

- PORAC concluded that the medical evidence in the long term disability claim file did not reflect that plaintiff was unable to perform the material duties of his occupation and, thus, that no long term disability benefits were payable. (Id.)

14

• PORAC advised plaintiff of his appeal rights.  (Id.)

**D.   Plaintiff's Initial Appeal and PORAC's Submission of the Claim for an Independent Medical Review**

On or about August 8, 2006, plaintiff sent a letter to PORAC asking it to reconsider the denial of his claim.  He stated that Dr. Senegor has found him permanently disabled as of April 13, 2006 and "[t]hough the radiological findings may be rather scant [he has] not ceased to have pain in [his] right leg and lower back since the injury [on July 15, 2004]."  (AR: P00207-208.) PORAC accepted the letter as plaintiff's request to appeal its decision and it informed plaintiff that his file would be submitted to an outside medical source for an independent review of the medical evidence.  Thereafter, on August 11, 2006, plaintiff submitted a one page letter from Dr. Senegor reiterating that:  "[Plaintiff's] lumbar spine condition, which I have been treating since 8/04/05, features low back and right leg pain.  The cause of the pain is industrial in origin related to a 7/15/04 injury at work."  (AR: P00203-04.)

PORAC sumbitted plaintiff's file to HCE Next Care Management for an independent medical review.  (AR: P00195-96.)  The claim file was reviewed by a Clinical Advisor, Board Certified in Orthopedics.  (AR: P00195.)  The reviewer was asked to answer the following questions: "1) Does the objective medical evidence support [the claimant's] inability to perform the Material Duties of his Own Occupation? 2) Are the subjective complaints supported by the objective medical documentation and do they prevent the clamant from performing the Material Duties of his Own Occupation? 3) If the evidence supports the claimant meeting the

plan document's definition of disability, please indicate as of what date?  When (if applicable) was he able to return to work, full duty? 4) Is there evidence of malingering or exaggeration of symptoms? 5) Is the claimant's ability to perform the Material Duties of his Own Occupation impaired by the use of medications? 6) Please provide a detailed synopsis of your findings."  (Id.)

In a letter dated August 16, 2006, those questions were answered as follows:

1.   The objective medical evidence does not support plaintiff's inability to perform the material duties of his occupation.  His examinations repeatedly failed to reveal clinical evidence of neurologic abnormalities and two lumbar spine MRI scans were within normal limits.

2.   Plaintiff's subjective complaints are not supported by the objective medical documentation and do not prevent him from performing the Material Duties of his Own Occupation.

3.   The medical evidence does not [meet] the Plan's definition of disability.

4.   Plaintiff was able to return to work in a full-duty capacity within 90 days of his July 15, 2004 injury. There is no clinical evidence documenting the need for ongoing treatment after the July 15, 2004 injury. In the absence of such evidence, he was able to return to work in an unrestricted capacity.

5.   The clinical advisor was not able to determine whether plaintiff was malingering or exaggerating his claim

16

without examining and interviewing him.

6.  Plaintiff's use of medications did not impair his ability to perform the material duties of his own occupation.  (AR: P00195-196.)

By letter dated August 28, 2006, Maria Jimenez of PORAC advised plaintiff that it was "still [PORAC's] determination that no benefits are payable."  The letter summarized the findings of the HCE Next Care Management clinical advisor and pointed out that all of the injury studies were within normal limits and that all physical examinations failed to exhibit neurologic abnormality.  The letter concluded that there were no objective findings in the medical records supporting the claim of disability.  Finally, this letter notified plaintiff that he now had the right to appeal the decision directly to the Insurance and Benefit Board of Trustees of PORAC and invited him to provide all additional documentation in support of the claim of disability. (AR: P00175-176.)

**E.  The Second Layer Of Appeal to the PORAC Board Of Trustees and PORAC's Request For An Independent Medical Examination Of Plaintiff**

In a September 6, 2006 telephone conversation, plaintiff advised Ms. Jimenez of his intention to appeal the denial of his appeal to the PORAC Board of Trustees.  Ms. Jimenez confirmed that conversation in a letter of the same date.  The letter enclosed a Physician's Report for plaintiff's physician to complete. (AR: P00172-173.)

On October 12, 2006, PORAC received a "Qualified or Agreed Medical Evaluator's Findings Summary Form (prepared in connection with plaintiff's workers compensation case), which was completed

17

by Eric E. Bugna, M.D., a specialist in orthopedics (AR: P00171), as well as a 15 page letter from Dr. Bugna (AR: P00177-191).  As part of his report, Dr. Bugna reviewed plaintiff's medical records, including the May 2005 and March 2006 MRI studies.  He notes that with respect to the two lumbar spine MRIs, he "agree[s] with the feelings of the interpreting radiologist," who found "[p]ain at the lumbosacral spine with concomitant lower extremity symptomatology, mechanical in etiology." (AR: P00186) Dr. Bugna concluded that in his opinion, plaintiff "does exhibit [a] disability precluding substantial work.  It . . . appear[s] that he has lost approximately 75% of his pre-injury capacity to perform work activities including lifting, bending, stooping, pulling, pushing, and the like." (AR: P00189.)

On October 20, 2006 PORAC notified plaintiff that his appeal was accepted by the Insurance and Benefits Trust of PORAC and that the appeal would be reviewed and discussed at the trustees' meeting on October 26, 2006.  Plaintiff was advised to provide a telephone number if he wished to participate in the appeal discussion.  (AR: P00170.)

On October 23, 2006 PORAC received a Physician's Report–Musculoskeletal, regarding plaintiff that was completed by Dr. Senegor on October 20, 2006.  (AR: P00168-169.)  As stated on that form, Dr. Senegor's primary diagnosis was lumbar degenerative disc disease.  He reported plaintiff's symptoms as lower back and bilateral leg pain radiating down towards the feet with numbness and tingling in the feet.  The form claimed plaintiff was temporarily totally disabled until December 21, 2006, with restrictions on lifting over ten pounds, excessive

bending, twisting or stooping and no continuous sitting or standing over 30-45 minutes. (AR: P00168.)

The trustees of the PORAC Insurance and Benefit Trust met and discussed plaintiff's appeal on October 26, 2006. Plaintiff was contacted by telephone during that meeting. He advised the trustees that he would not be able to return to work, had submitted paperwork to apply for "disability retirement" and was waiting for information that could take 6-9 months to approve. After terminating the telephone conference with plaintiff, the trustees further discussed his appeal and decided to ask plaintiff to submit to an independent medical examination because of conflicting medical reports in his claim file. (AR: P00166.) Plaintiff was notified of this decision by letter dated October 27, 2006. (AR: P00164.)

On November 2, 2006, plaintiff faxed a one page note to Ms. Jimenez of PORAC stating "human resources has advised me that I can no long [sic] work in my hired position with the county." (AR: P00162.)

On December 6, 2006, Renee Lugo of PORAC notified plaintiff that it had scheduled an independent medical examination ("IME") for plaintiff with Ernest Miller, M.D. for January 4, 2007. (AR: P00153.) Dr. Miller reviewed plaintiff's medical records and the IME went forward on January 4, 2007.

Thereafter, Dr. Miller submitted to PORAC a 14 page report regarding his findings and conclusions. (AR: P00116-129.) Dr. Miller's physical examination demonstrated a lumbar spine range of motion that was 100% of normal. Lateral bending also was 100% of normal. (AR: P00126.) Dr. Miller stated that in his

opinion, the MRI study of May 3, 2005 is "completely normal considering age, weight, and sex.  There is no evidence on the MRI study to support an injury of the lower back."  (AR: P00127.)  Dr. Miller's diagnoses were "1. Gross exogenous obesity. 2. Hyperlipidemia. 3. Chronic lower back pain, with a normal MRI study demonstrating age, weight, and sex appropriate degenerative changes diffuse in lumbar spine. 4. History of fall with back injury and chronic pain in lower back and right lower extremity. 5. Rule out avascular necrosis, arthritis, right hip. 6. Rule out bone tumor, bone infection, stress fracture, right femur."  (Id.)

Ultimately, Dr. Miller concluded that his "[e]valuation [of plaintiff] is quite frankly unremarkable.  Physical examination, review of medical records, and understanding of oral history provided no illustration of the nature of the industrial injury and eight foot fall onto the lower back and right side."  (Id.)

On January 25, 2007, PORAC notified plaintiff that it was upholding the denial of his claim, based on a recap of the original denial, the medical documentation that supported the denial and the findings of Dr. Miller's IME.  (AR: P00098.)  On March 2, 2007, plaintiff's attorney, David Allen, requested a copy of plaintiff's claim file.  On April 13, 2007, PORAC provided the file.

Thereafter, Mr. Allen submitted additional documents to PORAC by letter of October 24, 2007.  (AR: P00061-74.)  The additional documents included plaintiff's final workers' compensation determination finding a "permanent disability of 25%" (AR: P00065), a letter from the County of San Joaquin Human Resources Division noting that Dr. Bugna found plaintiff to have

"permanent work restrictions" and a document on Mr. Allen's
letterhead but allegedly signed by Dr. Senegor, which reiterated
the diagnosis of lumbar degenerative disc disease. (AR:
P00069-72).  PORAC acknowledged receipt of Mr. Allen's letter on
November 29, 2007, and provided Mr. Allen with copies of
plaintiff's initial application for long term disability
benefits, plaintiff's Employer's Statement and plaintiff's job
description. (AR: P00049.)

On October 19, 2007, plaintiff underwent an IME by Dr. Baer
I. Rambach, an orthopedic surgeon.  Dr. Rambach reported that
plaintiff was currently 300 pounds and that in his opinion, he
was "substantially incapacitated from performing the usual
duties" of his job as a correctional officer as he would be
"unable to intervene in an altercation between inmates;" he could
not run, take down or control a combative inmate; "he is markedly
limited in his ability to bend, squat or stoop becuase of his
deconditioned state and obesity, which in turn as imposed an
extra load and stress on his body mechanics and particularly on
the lumbosacral spine and lower extremities."  (AR: P00004-14.)
Dr. Rambach concluded that plaintiff's injuries were attributable
to the accidents in June and July 2004; he found that the
injuries were soft tissue in nature and "should have resolved
with appropriate treatment" but plaintiff "allowed himself to
gain weight, and become excessively deconditioned to the point
that he even uses a cane in his right hand when ambulating."
(AR: P00010.)

Thereafter, on February 11, 2008, Mr. Allen provided PORAC a
copy of a letter from the Chief Executive Officer of the San

Joaquin County Employees' Retirement Association ("SJCERA") to plaintiff notifying him that the Board of Directors of SJCERA had approved plaintiff's application for a service-related disability retirement. (AR: P00048, P00018.)  Mr. Allen stated that the letter was submitted "to show the severity of Jerry Thompson's condition."  (AR: P00048.)

Plaintiff filed the instant action on March 25, 2008.

**STANDARD**

Before reaching the merits of the parties' motions, the court must determine whether to apply de novo or abuse of discretion review to PORAC's denial of plaintiff's LTD benefits. The Plan at issue here is governed by ERISA.  In Firestone Tire & Rubber Co. v. Bruch, the United States Supreme Court held that a challenge to the denial of benefits under an ERISA plan is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  489 U.S. 101, 115 (1989).  When a plan document gives an administrator such discretionary authority, a court must apply the "abuse of discretion" or "arbitrary and capricious" standard of review to its decision to deny benefits.  Id. at 111; see also Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006).

In this case, the Plan unambiguously grants PORAC discretion when reviewing claims.  The Plan expressly states PORAC has "full and exclusive authority to control and manage the Plan, to administer claims, and to interpret the Plan and resolve all questions arising in the administration, interpretation, and application of the Plan[,]" which includes the "right to

determine" eligibility for coverage, entitlement to benefits, the amount of benefits payable and the sufficiency and amount of information required of the claimant to permit PORAC to make these determinations.  (AR: P00455.)

Only where there are procedural violations "so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm," does the court apply de novo review despite the discretionary grant of authority.  Gatti v. Reliance Standard Life Ins. Co., 415 F.3d 978, 985 (9th Cir. 2005).  As an example of what constitutes "wholesale and flagrant violations of the procedural requirements of ERISA," the Ninth Circuit in Abatie cited the facts in Blau v. Del Monte Corp., 748 F.2d 1348 (9th Cir. 1984), noting that in Blau, "the administrator had kept the policy details secret from the employees, offered them no claims procedure, and did not provide them in writing the relevant plan information." Abatie, 458 F.3d at 971.

Plaintiff contends here that the following procedural violations by PORAC mandate de novo review: (1) PORAC failed to provide plaintiff with a copy of Dr. Miller's IME report; (2) PORAC failed to provide plaintiff with a copy of his claim file within 30 days of plaintiff's request; and (3) PORAC breached its fiduciary duties by failing to investigate an inconsistency in Dr. Miller's report of plaintiff's mechanism of injury (plaintiff contends Dr. Miller inaccurately found that plaintiff's injuries were attributable to his June 2004 fall from a wall as opposed to his July 2004 fall while running).  However, even assuming the truth of these allegations, such failures by a plan administrator

23

do not constitute a complete failure "to comply with virtually every applicable mandate of ERISA" as is required under <u>Abatie</u> to apply de novo review, despite the discretionary grant of authority.  <u>Id.</u>   At most, these errors represent mere "procedural irregularities" which can be weighed by the court in deciding whether the administrator abused its discretion.  <u>Id.</u> at 972 (recognizing that a "procedural irregularity in processing an ERISA claim does not usually justify de novo review," rather like a conflict of interest, the procedural irregularity is a "matter to be weighed in deciding whether an administrator's decision was an abuse of discretion").  Only where the procedural violations are so "flagrant" so as to "alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm" does the court apply de novo review.  <u>Id.</u> at 985.  Here, plaintiff has not established that any of these alleged violations by PORAC impacted the quality of his review by the administrator nor prejudiced him.

Indeed, even if the allegations were legally sufficient to raise a justification for application of de novo review, the allegations are demonstrably false and/or irrelevant to the court's inquiry.  First, PORAC provided plaintiff a copy of the IME by Dr. Miller; said copy was attached to PORAC's January 25, 2007 letter denying plaintiff's appeal.  (AR: P00098.)  It was also provided to plaintiff's counsel on April 13, 2007.  (AR: P00084.)  Additionally, while PORAC did not respond to plaintiff's request for a copy of his claim file within 30 days of the request, it did respond promptly--in just 36 days.  As set forth above, that procedural irregularity, if any, is immaterial

to this court's inquiry as plaintiff has failed to show that the brief delay prejudiced him.[4]  Finally, even if Dr. Miller confused plaintiff's alleged June 2004 fall with his July 2004 fall, that mistake is not relevant to the pertinent inquiry before the plan administrator and now this court.  *How* plaintiff sustained his injuries is not particularly relevant to this case.  As opposed to plaintiff's worker's compensation claim, where the determination of whether plaintiff sustained an industrial injury is critical, here what is relevant is whether the injuries plaintiff sustained prevented him performing the material duties of his occupation.

### ANALYSIS

Applying the abuse of discretion standard of review, the sole issue before the court is whether PORAC abused its discretion, or in other words, acted arbitrarily and capriciously, in denying plaintiff's LTD benefits claim.  An administrator's decision is an abuse of discretion only when it is without reason, unsupported by substantial evidence or erroneous as a matter of law.  See Montour v. Hartford Life & Accident Insur. Co., – F.3d –, No. 08-55803, 2009 WL 2914516, *4 (9th Cir. Sept. 14, 2009); Taft v. Equitable Life Ins. Co., 9

---

[4]     Moreover, it is not clear that any provision of ERISA *requires* PORAC to provide the claim file within 30 days of a request by a claimant.  The claim file is not among the documents specifically enumerated by the statute (29 U.S.C. § 1024(b)(4)), though admittedly, it is akin to those documents. See Hughes Salaried Retirees Action Committee v. Administrator of the Hughes Non-Bargaining Retirement Plan, 72 F.3d 686, 691 (9th Cir. 1995) (holding that the term "other instruments under which the plan is established or operated" refers to "documents that are similar in nature to the documetns specifically listed in [ERISA § 104(b)(4)]").

F.3d 1469, 1472 (9th Cir. 1994).  So long as the administrator's decision has a rational basis, the court is not free to substitute its own judgment for that of the administrator in determining the eligibility for plan benefits even if the court disagrees with that decision.  Id.  Under the abuse of discretion standard, the only issue is whether, on the evidence considered, the administrator's determination was "reasonable."  Horan v. Kaiser Steel Retirement Plan, 947 F.2d 1412, 1417 (9th Cir. 1991); see also Clark v. Wash. Teamsters Welfare Trust, 8 F.3d 1429, 1432 (9th Cir. 1993) ("Our inquiry is not into whose interpretation of plan documents is most persuasive, but whether the plan administrator's interpretation is unreasonable.")

Ultimately, in cases such as this one, where there is no conflict of interest, structural or otherwise,[5] judicial review of a plan administrator's determination involves a "straight-forward application of the abuse of discretion standard."  Montour, 2009 WL 2914516 at *4.  The plan administrator's decision can be upheld if it is "grounded on *any* reasonable basis."  Id. (emphasis in original).  "In other words, where there is no risk of bias on the part of the administrator, the existence of a 'single persuasive medical opinion' supporting the administrator's decision can be sufficient to affirm, so long as the administrator does not construe the language of the plan unreasonably or render its decision without explanation."  Id. (citations omitted).

---

[5]    As set forth above, the Plan here is 100% funded during the self-funded period by contributions from Plan participants. PORAC derives no financial benefit in the event of a denial of a participant's claim for benefits.

1    Moreover, the scope of review under the arbitrary and

2  capricious standard is very limited.  The focus of an abuse of

3  discretion inquiry is the administrator's analysis of the

4  administrative record--it is not an inquiry into the underlying

5  facts.  <u>Alford v. DCH Found Group Long-Term Disability Plan</u>, 311

6  F.3d 955, 957 (9th Cir. 2002).  Thus, the court will not consider

7  information outside the administrative record, as it would be

8  improper to find a claims administrator abused its discretion

9  based on evidence not before it at the time the decision was

10 made.  <u>Taft</u>, 9 F.3d at 1472.

11   Here, a review of the administrative record reveals that

12 PORAC did not abuse its discretion in denying plaintiff's LTD

13 benefits claim.  The evidence shows that PORAC reasonably

14 concluded that plaintiff was not disabled, based on the materials

15 and records at its disposal, and PORAC's diligent and thorough

16 review of plaintiff's claim demonstrates that any minor

17 procedural irregularities, to the extent they occurred, did not

18 bias PORAC against plaintiff or otherwise prejudice him.

19   Plaintiff's primary argument is that PORAC abused its

20 discretion by ignoring plaintiff's subjective complaints of pain

21 and requiring "objective" medical evidence of plaintiff's

22 disability, when no such requirement exists in the Plan.

23 Plaintiff's argument is unavailing.  A reasonable review of the

24 administrative record reflects that PORAC engaged in a thorough

25 review of plaintiff's medical records, and specifically

26 considered plaintiff's reports of pain.  (<u>See</u> AR: P00214, P00176

27 [noting that plaintiff's symptoms are "low back pain and right

28 leg pain" and finding that his "subjective complaints are not

supported by objective medical documentation *nor do they prevent [plaintiff] from performing the Material Duties of his Own Occupation*") (emphasis added).  PORAC was justified in considering the lack of "objective" medical evidence supporting a finding of a disability.  <u>Safavi v. SBC Disability Income Plan</u>, 493 F. Supp. 2d 1107, 1118 (C.D. Cal. 2007) (rejecting argument that plan administrator should not be allowed to take lack of objective evidence in to consideration at all).

In this case, plaintiff's medical records showed that his initial complaint of knee pain subsided and an MRI of plaintiff's knee was normal.  (AR: P00307.)  Two MRIs of plaintiff's lumbar spine showed normal findings.  Indeed, plaintiff's own treating physician, Dr. Senegor, stated that the diagnostic tests revealed only "very mild" facet changes (AR: P00264) and that the "overall extent of the disability with regards to the lumbar spine does not match the patient's radiological findings which are rather scant."  (AR: P00263.)  Because of Dr. Senegor's contrary findings, however, offered at times in support of plaintiff's claimed disability, PORAC conducted an IME of plaintiff.  That IME by Dr. Miller confirmed that (1) plaintiff's lateral bending was 100% of normal; (2) his lumbar spine range of motion was 100% of normal; and (3) the evaluation of plaintiff's physical capacity was otherwise "unremarkable."

Plaintiff places much emphasis on Dr. Senegor's ultimate *conclusion* that plaintiff was disabled, nothwithstanding the lack of medical *evidence* to substantiate that conclusion.  A plan administrator is not required to accord special weight to the opinions of a claimant's physician.  Nor may this court impose on

the plan administrator a discrete burden of explanation when it credits reliable evidence that conflicts with a treating physician's evaluation.  <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003).  PORAC properly questioned Dr. Seneger's findings, many of which were internally inconsistent, and it reasonably relied on the findings of the IME, particularly considering that those findings were consistent with even some of Dr. Senegor's own conclusions, as well as the two MRIs and the independent file review preformed by HCE Next Care Management.

Under abuse of discretion review, this court must uphold the administrator's decision if it is based on "any reasonable basis."  <u>Montour</u>, 2009 WL 2914516 at *4.  Where there is no risk of bias on the part of the administrator, as is the case here, "the existence of a 'single persuasive medical opinion' supporting the administrator's decision can be sufficient to affirm, so long as the administrator does not construe the language of the plan unreasonably or render its decision without explanation."  <u>Id.</u>  Here, Dr. Miller's IME report sufficiently supports PORAC's denial of benefits to plaintiff.  Moreover, plaintiff does not argue that PORAC improperly interpreted any Plan provisions, and PORAC adequately explained its decision to deny benefits at each level--initial, appeal and board of trustees.

As a final argument, plaintiff contends that PORAC acted arbitrarily and capriciously in denying his claim because it failed to consider the award of benefits by the Social Security Administration ("SSA") and the SJCERA.  However, PORAC had no obligation to consider the SSA's award of benefits since there is

no evidence in the administrative record of any such award.
Indeed, in the claims process, plaintiff indicated that he had
not applied for SSA benefits.  (AR: P00025.)  The focus of an
abuse of discretion inquiry is the administrator's analysis of
the administrative record.  <u>Alford</u>, 311 F.3d at 957.  The court
may not consider information outside the administrative record,
as it would be improper to find a claims administrator abused its
discretion based on evidence not before it at the time the
decision was made.  <u>Taft</u>, 9 F.3d at 1472.  Thus, the court cannot
find any error by PORAC in failing to consider plaintiff's SAA
award.

Moreover, the court notes that even if evidence of an SSA
award was before PORAC, contrary to plaintiff's protestations,
PORAC would not have been *required* to accept the SSA's findings.
The Ninth Circuit has long recognized that there are critical
legal differences between disability determinations made in SSA
proceedings and ERISA actions, and an ERISA plan administrator is
not required to accept SSA findings.  <u>See</u> <u>Madden v. ITT Long Term</u>
<u>Disability Plan for Salaried Employees</u>, 914 F.2d 1279, 1286 (9th
Cir. 1991) (upholding a denial of long-term disability benefits
under the "any occupation" standard even when social security
disability benefits had been awarded); <u>Hamma v. Intel Corp.</u>, – F.
Supp. 2d –, No. 07-1795 GEB/CMK, 2009 WL 799283, *6 (E.D. Cal.
Mar. 23, 2009) (holding that "plan administrators are not
constrained by an award of Social Security benefits . . . because
'the test for Social Security disability is different than that
required under ERISA'") (citations omitted).

For the same reasons, PORAC did not err in failing to consider the SJCERA's award of service-related disability retirement benefits.  While there is evidence in the record of this award, plaintiff submitted said evidence in February 2008, long after the claims and appeal decisions in this case. Moreover, even if PORAC had access to these records previously, it was not required to accept the association's findings. Plaintiff has made no showing, here, that the association's findings were made under standards akin to ERISA, and presumably, like the SSA, the standards would differ.  Therefore, the court cannot find that PORAC acted arbitrarily and capriciously in failing to consider plaintiff's SSA and SJCERA awards.

**CONCLUSION**

For the foregoing reasons, the court DENIES plaintiff's motion for judgment in his favor and HEREBY GRANTS judgment in favor of PORAC.  The Clerk of the Court is directed to close this file.

IT IS SO ORDERED.

DATED: September 30, 2009

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE